OPINION *Page 2 
{¶ 1} Appellant Michael Hilton ("Father") appeals the November 16, 2006 Judgment Entries entered by the Richland County Court of Common Pleas, Juvenile Division, which approved and adopted the Magistrate's July 10, 2006 Decisions, terminating Father's parental rights, privileges, and responsibilities with respect to his minor daughters, and granting permanent custody of the girls to the Richland County Children Services Board ("the department").[1]
 STATEMENT OF THE CASE AND FACTS {¶ 2} On December 11, 2003, the department filed Complaints, alleging Ashley Hilton (DOB 11/13/00) and Kayla Hilton (DOB 10/18/95) were dependent and/or neglected children, and seeking temporary custody of the girls. The Complaints were based upon the mental health difficulties and/or other personal problems of Father and Krysa Hilton ("Mother") and their unwillingness or inability to provide a sanitary, safe home for the children.[2]
 {¶ 3} Prior to the filing of the Complaints, on May 6, 2003, paramedics and police responded to the Hilton residence at 243 Park Drive, in Mansfield, Ohio, after Kayla called 911 for assistance with Father, who was having a medical emergency.[3] Mother was in Cleveland at the time, receiving treatment for her mental health illness. When the paramedics and police arrived, they found the residence in deplorable *Page 3 
condition, which caused concern Kayla and Ashley might be neglected. Father and Mother were charged with child endangerment. At the time of the incident, the police and Father made arrangements for Kayla and Ashley to live with Mother's first cousin, Danelle Allen and her husband, Enrico.
 {¶ 4} Upon investigation by the department, the parents were found neglectful for failing to provide a clean, safe environment for the girls. The parents were also found to be neglectful for failing to provide education for Kayla through the public school system or home schooling. On June 2, 2003, Magistrate Harper of the Richland County Juvenile Court conducted a hearing to determine the truancy charges of Kayla. Magistrate Harper ordered the children remain with Mr. and Mrs. Allen; Kayla attend summer school; and the Richland County Prosecutor's Office pursue contributing charges against Mother and Father. The department agreed upon a case plan with Mother and Father, but the parents failed to meet the goals of that plan.
 {¶ 5} Over the course of time, the Allens became unable or unwilling to care for the children. There were no other relatives known or available to care for the girls. As a result, the department filed the Complaints for temporary custody on December 11, 2003.
 {¶ 6} The trial court found Kayla and Ashley to be dependent and placed them in the temporary custody of the department. The trial court approved and adopted a case plan for Father, which included completing parenting skills classes; undergoing a psychological evaluation and following all recommendations; obtaining appropriate housing; and obtaining employment. At the annual review hearing on December 1, 2004, the trial court found the children's legal status as dependent children remained, *Page 4 
and it was in their best interests to remain in foster care. The trial court further found Father had made some progress in complying with his case plan. The trial court ordered temporary custody be continued with the department. Sometime in May, 2005, after being in two different foster homes, Kayla and Ashley were placed in the home of their maternal grandparents, Art and Karen Monastere.
 {¶ 7} On July 15, 2005, the department filed an Amended Motion for Disposition, seeking permanent custody or, in the alternative, placement of the children in the legal custody of the Monasteres. In the motion, the department explained Mother and Father had made minimal progress on their case plans and the department did not expect to reunify the children with either parent within the next six months. The magistrate conducted a hearing on the motion, which spanned six days between January 27, 2006, and May 31, 2006. On the first day of the hearing, Mother informed the trial court she wished to agree to the termination of her parental rights as to Kayla and Ashley.
 {¶ 8} At the hearing, Dr. Steven Burggraf, director of Family Life Counseling, testified he conducted a psychological evaluation of Father on February 3, 2005. As part of the evaluation, Dr. Burggraf conducted a psychological status interview, implemented three tests, and gathered a pycho-social history. The results of the Minnesota Multiphasic Personality Inventory II indicated Father has chronic personality problems, including impulsive, angry and manipulative behaviors. The results also show Father is likely to be somewhat aggressive in his relationships and may interact with others in a caustic manner. Individuals with Father's profile type have a tendency to engage in irresponsible, immature, and possibly antisocial behaviors. Such individuals have rebellious attitudes toward authority figures, stormy family relationships, *Page 5 
and tend to blame others for their problems. These individuals also tend to be somewhat self centered and engage in actions leading to self gratification, and live pleasure oriented lifestyles. Dr. Burggraf noted individuals with this extreme personality disorder pattern are unlikely to change. Dr. Burggraf observed a correlation between this profile and Father's historical behavior pattern. The doctor added personality disorders by their definitions are usually chronic and pervasive and not subject to change even with medication and/or counseling.
 {¶ 9} Dr. Burggraf confirmed a previous diagnosis of Bi-Polar II Disorder and, additionally, diagnosed Father with Passive Aggressive Personality Disorder. The doctor explained the essential feature of the passive aggressive disorder is a pervasive pattern of negativistic attitudes and a passive resistance to the demands of adequate performance in social and occupational situations. Dr. Burggraf stated he sees the feature reflected in Father's history. Dr. Burggraf explained Father had made minimal effort in fulfilling the requirements of his case plan and did not fully participate in his psychological treatment plan. With respect to Father's ability to perform necessary functions such as holding down a job or maintaining a clean residence, Dr. Burggraf stated Father could not correct the problems despite numerous efforts.
 {¶ 10} Father's evaluation did not reveal any delusional thinking or psychosis. Father was, however, emotionally suspicious, meaning he feels people are out to get him or working against him. Father reported having some panic attacks and symptoms of depression. Father admitted his last suicidal episode was in May, 2003. Father informed Dr. Burggraf he had three psychiatric hospitalizations, two of which occurred between 2003, and 2004. *Page 6 
 {¶ 11} Dr. Burggraf proceeded to discuss the results of the GAMA Test which measures the general abilities of an adult individual. Father scored a GAMA IQ score of 118, which falls into the high average category of mental ability. Despite his IQ, Father's mental instability is chronic and pervasive. When Father is not compliant with his medication, the symptoms are acute and he engages in at-risk, irresponsible behavior. Dr. Burggraf continued, even when Father was in treatment, he still could not hold down a job or assist in fulfilling his case plan. The doctor concluded Father's mental instability is not likely to improve to such a degree he could independently and competently parent Kayla and Ashley. Dr. Burggraf opined Father was a risk to the children.
 {¶ 12} Rodney Parson, the clinical therapist working with Ashley, described Ashley's behavior at their first session on April 14, 2005. He recalled Ashley was very withdrawn and had a lot of difficulty interacting with him and other adults in the room. When Ashley entered his office, she huddled in a fetal position on the floor behind the door. Parson was able to bring Ashley out from behind the door by engaging her with various toys in his office. Parsons explained Ashley's play with the toys in the sandbox indicated a fear factor, signs of withdrawal, and depression.
 {¶ 13} Parson described the events of a number of sessions he conducted with Ashley. He testified he had seen Ashley on a weekly basis between August 25, 2005, and October 13, 2005. Parson opined Ashley had been abused by Father. Parson added the girl's nonverbal and verbal disclosures indicated there had been some traumatic event in her life, and she has presentation of some form of sexual abuse. Parson explained consistency and stability in the home are vital parts of the *Page 7 
development of a child, and, Ashley needed the permanency provided to her by her grandmother.
 {¶ 14} Ann Bargahiser, the court appointed special advocate for Ashley and Kayla, testified regarding the findings and conclusions she presented to the trial court in her report. She stated her belief both girls had been abused, and she believed Ashley had been abused by Father. She advised, if the department was not granted permanent custody, under no circumstances should Kayla and Ashley be allowed to have unsupervised visits with Father. Her reason for this was her concern for the girls' safety.
 {¶ 15} Edith Gilliland, the court appointed attorney for the children, testified on Father's behalf. She testified she observed the children on visits with Father on two occasions. She found the interaction between the girls and Father to be normal and neither showed a fear of him. Father and children were bonded and their behaviors revealed a love between them. Both girls indicated they wanted to go home with Father. On cross-examination, the witness acknowledged she had had less than half an hour of direct contact with Kayla and Ashley.
 {¶ 16} Shawn Strong, the department social worker assigned to the case, testified he became involved with the family on April 20, 2004. In familiarizing himself with the case, he spoke with Father and Mother as well as the foster parents. Strong provided the court with an overview of Father's compliance with his case plan. Father was required to provide Kayla and Ashley a safe, clean, and hazard free home. Strong visited Father's home six weeks prior to the hearing, and described the house as dirty and cluttered, and recalled an intense cat odor permeated the residence. Father and *Page 8 
his girlfriend have six cats and have placed several litter boxes around the house. Strong noticed kitty liter and cat feces on the floor. In the kitchen, Strong observed pots and pans and dishes on the floor, and the stovetop was dismantled from the oven. The bedrooms were cluttered and filled with trash, and the bathrooms were dirty. Strong concluded the home is not presently safe, clean, or hazard free. With respect to the case plan requirement Father obtain verifiable income without interruption for at least six months, Strong indicated Father worked a couple of jobs during the course of the proceeding, but his employment only lasted a couple of months. Father receives disability income of $115/month. Father had not provided any documentation indicating he is restricted from employment.
 {¶ 17} Strong stated he was unaware if Father has followed the recommendations of Dr. Burggraf which included continued psychiatric and mental health services. Strong discussed his observations of Father during visits as well as information he received from other social service workers involved in the case. Strong commented he feels Father's boundaries with the girls are questionable. Strong stated the girls' demeanor does not improve after visiting Father. On occasion, Strong had observed them backslide after visits.
 {¶ 18} Father lives with his girlfriend, Dawn, and her sixteen year old son, George. The department is involved with Dawn and George. The department received information from a referral call, indicating Father and Dawn provided George with access to pornography, and allowed the boy to drink and snort pills. Strong has spoken with Father about George and what is happening in George's life. Strong has been present when George is speaking with his case worker. Given what he has learned, *Page 9 
Strong expressed his concerns about Father's parenting ability in general. Strong recalled Father casually acknowledged George's use of marijuana.
 {¶ 19} At the conclusion of the evidence on the hearing prior to May 31, 2006, the magistrate considered the trial completed. However, the magistrate determined she needed additional evidence from Karen Monastere, the current custodian and grandmother of the children, and asked her to appear on the final day of the hearing to answer questions. Monastere testified Father had only attended two of the six visits scheduled between the prior hearing and this hearing. Monastere noted after visits with Father, the girls do not listen and often back talk. Ashley and Kayla did not actively resist going to visit Father, however, the girls were troubled prior to the visits, uncertain of whether Father would appear. Monastere indicated she and her husband are willing to take legal custody of the girls if the trial court did not grant permanent custody to the department. Her main concern with legal custody as the outcome was the fact Father would still have visitation.
 {¶ 20} Monastere testified, over the years, she and her husband have given financial help to Father and Mother. When the girls were initially removed, Mother and Father moved to Columbus, and Monastere paid for their transportation to visits. Monastere commented she and her husband have done everything to keep the family together. However, she could not tolerate Father's exposing the girls to wiccan practices. She had seen what appeared to be voodoo dolls stuck with pins at Father's residence. Monastere repeatedly stated her commitment to Kayla and Ashley, noting she would not give up custody, regardless of the outcome. *Page 10 
 {¶ 21} On July 10, 2006, the magistrate issued her decision, recommending Father's parental rights, privileges, and responsibilities be terminated, and permanent custody be granted to the department. Father filed timely objections to the magistrate's decision.
 {¶ 22} Via Judgment Entry filed November 16, 2006, the trial court overruled Father's objections, and approved and adopted the magistrate's decision as the judgment and order of the court.
 {¶ 23} It is from this judgment entry Father appeals, raising the following assignments of error:
 {¶ 24} "I. TRIAL COURT'S CONCLUSION THAT PERMANENT CUSTODY WAS WARRANTED IS NOT SUPPORTED BY THE FACTS.
 {¶ 25} "II. TRIAL COURT'S ORDER THAT PERMANENT CUSTODY BE GRANTED WAS CONTRARY TO LAW.
 {¶ 26} "III. TRIAL COURT ERRED IN FINDING THAT RCCS MADE REASONABLE EFFORTS TO PREVENT CONTINUED REMOVAL OF KAYLA AND ASHLEY FROM THEIR HOME.
 {¶ 27} "IV. TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO FILE A WRIT OF PROCEDENDO."
 {¶ 28} This case comes to us on the expedited calendar and shall be considered in compliance with App.R. 11.1(C).
 I, II {¶ 29} Father's first and second assignments are interrelated and shall be addressed together. In his first assignment of error, Father argues the trial court's *Page 11 
conclusion the granting of permanent custody to the department was in the girls' best interest was not supported by the facts. In his second assignment of error, Father maintains the trial court's order granting permanent custody to the department was contrary to law as the trial court failed to consider whether the girls' need for a legally secure permanent placement could be achieved without granting permanent custody to the department.
 {¶ 30} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. . Jeffries (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279,376 N.E.2d 578.
 {¶ 31} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 32} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's *Page 12 
parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 33} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 34} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R .C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 35} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of *Page 13 
the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 36} As set forth in the Statement of the Case and Facts, supra, Shawn Strong, the social worker assigned to the case, detailed Father's failure to comply with his case plan. Father was unable to provide a clean, healthy environment for the girls, and could not maintain stable employment. The evidence showed Father had moved frequently prior to and during the course of the action. At the time of the hearing, Father was living with his girlfriend and her sixteen year old son, who were also involved with the department. The residence, which was maintained by Father's girlfriend, was filthy and cluttered.
 {¶ 37} Father places great emphasis on the trial court's reference to, and Monastere's concerns about, his wiccan practices. Although that issue was a factual finding, such did not tip the scales in the trial court's weighing the evidence in support of the grant of permanent custody. The entire record is replete with evidence about Father's mental health issues, which are chronic and pervasive, and Father's questionable compliance with counseling and medication.
 {¶ 38} Father's first and second assignments of error are overruled.
 III {¶ 39} In his third assignment of error, Father challenges the trial court's determination the department used reasonable efforts to assist him in completing the case plan and reasonable efforts to prevent the removal of Kayla and Ashley. *Page 14 
 {¶ 40} Pursuant to R.C. 2151.419, the agency which removed the child from the home must have made reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the home, or make it possible for the child to return home safely. The statute assigns the burden of proof to the agency to demonstrate it has made reasonable efforts.
 {¶ 41} The department implemented a comprehensive reunification plan to assist Father in remedying the problems which caused Kayla and Ashley to be removed. The case plan addressed Father's need to find and maintain stable housing and employment, obtain mental health treatment, and seek assistance with his parenting skills. Despite having approximately two and one half years to work on the case plan, Father did not comply with any of the requirements. The trial court found the department had made all reasonable, diligent efforts and had worked with Father with no significant improvement.
 {¶ 42} When a trial court is considering whether the agency made reasonable efforts to prevent the removal, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute. In re Brewer (Feb. 12, 1996), Belmont App. No. 94-B-28, 1996 WL 65939, at 3; In re Davidson-Rush, 5th Dist. No. 2006 CA 00121, 2006-Ohio-4873 at ¶ 50. "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).
 {¶ 43} We have reviewed the record, and find substantial evidence to establish Father made no progress toward alleviating the department's core concerns for the girls despite the department's reasonable efforts to reunify the family. *Page 15 
 {¶ 44} Father's third assignment of error is overruled.
 IV {¶ 45} In his final assignment of error, Father asserts his trial counsel was ineffective for failing to file a writ of procedendo.
 {¶ 46} Because of the importance of cases involving the termination of parental rights, the due process and equal protection clauses of the United States and Ohio Constitutions guarantee that indigent parents be provided with counsel and a transcript at public expense for appeals as of right. State ex rel. Heller v. Miller (1980), 61 Ohio St.2d 6, paragraph two of the syllabus. Accordingly, the General Assembly has provided parents involved in permanent custody proceedings with the right to counsel, which will be appointed by the court if the parent is indigent. R.C. 2151.352. See, also, Juv.R. 4. The right to counsel includes the right to the effective assistance of counsel. In reWingo, 143 Ohio App.3d 652, 666, 2001-Ohio-2477.
 {¶ 47} "The two-part test for ineffective assistance of counsel used in criminal cases, announced in Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, applies in actions by the state to force the permanent, involuntary termination of parental rights. Jones v. Lucas Cty. Children Services Bd. (1988),46 Ohio App.3d 85, 86, 546 N.E.2d 471. A claim for ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness.Strickland, supra; *Page 16 State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373." In re: UttChildren, Stark App. No. 2003CA00196, 2003-Ohio-4576.
 {¶ 48} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any give case, a strong presumption exists counsel's conduct fell within the wide range of reasonable professional assistance. Id.
 {¶ 49} In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. Prejudice from defective representation sufficient to justify reversal exists only where the result of the trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel.State v. Carter, 72 Ohio St.3d 545, 558, 1995-Ohio-104, citingLockhart v. Fretwell (1993), 506 U.S. 364, 370, 113 S.Ct. 838,122 L.Ed.2d 180.
 {¶ 50} R.C. 2151.414 provides a permanent custody proceeding should occur within certain time frames. For instance, a hearing on the motion should be scheduled "not later than one hundred twenty days after the agency files the motion for permanent custody", and the motion should be disposed of "not later than two hundred days after the agency files the motion." R.C. 2151.414(A)(2). However, these time limits do "not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court." Id.
 {¶ 51} The Ohio Supreme Court has stated similar time limits are directory, not mandatory, and such do not provide a basis for attacking the validity of the trial court's *Page 17 
judgment. See, In re Davis, 84 Ohio St.3d 520, 522-523, 1999-Ohio-0419. A litigant must seek a writ of procedendo against the juvenile court if it does not comply with statutory time limits. Id. at 523-524. If a party does not seek such a writ, then he is estopped from complaining on appeal the delay by the juvenile court violated that party's due process rights. Id. at 524.
 {¶ 52} Assuming, arguendo, trial counsel's performance fell below an objective standard of reasonable representation, we find Father cannot satisfy the second prong of the Strickland test or establish how his due process rights were violated. Father continued to have visits with Kayla and Ashley. The record before this Court shows the case remained active and ongoing. We cannot conclude Father was prejudiced by trial counsel's failure to file a writ of procedendo.
 {¶ 53} Father's third assignment of error is overruled.
 {¶ 54} The judgment of the Richland County Court of Common Pleas, Juvenile Division, is affirmed.
 By: Hoffman, J. Gwin, P.J. and Edwards, J. concur *Page 18 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Richland County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to Appellant.
[1] The department has not filed briefs in these matters.
[2] During the course of these proceedings, Mother voluntarily terminated her parental rights, privileges and responsibilities with respect to the girls. As such, Mother has not filed a brief with this Court.
[3] From the record, it appears Father had attempted suicide. *Page 1